566 So.2d 832 (1990)
Richard WHITE, et al., Appellants,
v.
T.H. BROUSSEAU, et al., Appellees.
No. 89-1669.
District Court of Appeal of Florida, Fifth District.
August 23, 1990.
Rehearing Denied September 28, 1990.
*833 Charles M. Holcomb, Cocoa, for appellants.
Louis Ossinsky, Jr., of Ossinsky, Krol and Hess, Daytona Beach, for appellees.
COWART, Judge.
This case involves an action to quiet title by a contract seller of land to forfeit and terminate the legal and equitable rights of defaulting contract buyers in lieu of an action in equity by the seller to foreclose the buyers' equity of redemption in the manner that mortgages are foreclosed.
Appellee ("the first party"), as seller, agreed to sell, and appellants, as buyers, agreed in writing to buy a certain parcel of land for $10,000 payable $4,000 down and the balance of $6,000 in consecutive semiannual installments of $800 each including interest at 12%.[1]
The seller agreed to furnish title insurance at the buyers' expense. The buyers agreed to pay future taxes. The contract contains no provision as to which party, buyer or seller, was entitled to possession during the term of the contract. The seller agreed upon final payment to convey title to the buyers by quit-claim deed. The contract is on a "store-bought" form (RAMCO FORM 70) which contains a printed provision that:
At any time during the term of this contract that any payment becomes delinquent ninety (90) days or more, this contract shall become null & void and any and all monies paid in shall become forfieted [sic] to the first party.
The buyers failed to pay the first installment payment and, 90 days thereafter, the seller duly notified the buyers that pursuant to the forfeiture provision, the contract was considered "null & void."
The seller filed an action seeking, in Count I, to quiet title against certain third parties and, in Count II, "to foreclose" the land contract.[2] The buyers answered alleging that the seller breached the contract by failing to furnish title insurance as agreed when the buyers had, before the action was filed, offered to pay the seller the balance due and sought, alternatively, damages for breach of contract and specific performance of the contract. After a non-jury trial, the trial court entered a final judgment adjudicating that the buyers had defaulted *834 under the contract "by failing to make payments when due and that acceleration of the debt and notice thereof is not necessary under the instant circumstances." The judgment purported to "cancel" the buyers' claim and quiet title in the seller. The buyers appeal. We reverse.
In the earlier development of the English common-law, there was but one body of law and the court could render only judgments for money. Although under the feudal system many complicated interests or estates in land existed, they had but one time dimension, present estates or future interests. The present estate had the right to seisin (possession or right of use) and the law courts ultimately developed a non-money remedy of ejectment to effectuate that right. There was no concept of a lien interest in land. If land was used to secure a debt, the debtor conveyed the legal title to the creditor who promised to re-convey when the debt was paid. However, if the creditor breached his promise to re-convey, a serious problem resulted. The law court was required to recognize the creditor's legal title and hence his right to possession; the court was required to deny ejectment and the debtor's only remedy was an action in assumpsit for a money judgment for damages for the creditor's breach of promise to re-convey and the debtor could not recover his ancestral estate. However, because England was a monarchy and the king was lord paramount with the ultimate power, the debtor had a potential political remedy. The debtor could petition the king who, after consulting his own conscience or that of his religious advisor, the chancellor, could direct the creditor to re-convey the security land to the debtor or suffer the displeasure of the king with consequences more serious than present day civil or criminal contempt actions. When the case load of petitions for extra-ordinary relief became too great, the king merely directed those petitions to the chancellor for action in the king's name from which practice evolved the second great body of English law known as chancery or equity, with its own set of principles or maxims and with general authority and jurisdiction to grant relief that was right and just in all cases where the money judgment of a court of law was inadequate.[3] This second body of "law" came to recognize a second level or dimension of "equitable" interests in land with equitable rights enforceable only in equity courts. When, under any circumstances, the bare legal title to land was in one person but in fairness and justice another person was entitled to it, equity held that the equitable title to the land was in the true beneficial equitable owner, and provided a remedy to effectuate the transfer of legal title to the equitable owner. Thus developed the present day concept of trusts and equitable remedies including that of specific performance. In the meantime, the common law, continuing to evolve, came to recognize legal lien interests in land but law courts continued to be limited in remedy to money judgments. Equity also came to recognize that sometimes in fairness and justice a creditor without a legal title or lien interest in land was entitled to look to certain land as security for debt and for that purpose, equity conceived the concept of an equitable lien and evolved a remedy in which it cut off or foreclosed the rights of other legal and equitable title or lien holders and caused land that was subject to legal or equitable liens to be judicially sold in order to obtain money to pay the legal and equitable lien holders. When the title of the true legal and equitable title holders to the land was subject to invalid or inferior claims, clouds, doubts, and suspicions in favor of others, courts of equity evolved a remedy for the legal title holder to bring a quiet title suit to have the equity court adjudicate that the apparent claims of others were invalid and that the owner's legal title was good and free of the invalid or inferior claims.
Except only as prohibited by strong public policy, United States citizens have the freedom to contract as they see fit and *835 generally law courts have no discretion and must award money damages for the breach of agreements which law judges may deem to be unfair. At least until lately,[4] the line between law and equity was clear and judges exercising equitable jurisdiction had broad discretion to deny all equitable relief where to grant it would violate established equitable principles. Equity jurisprudence not only recognized interests in land not cognizable by law courts and had great concern that equitable rights be respected, but when just and fair that they be terminated, such termination was required to be done with equity's characteristic concern for fairness. Equity abhors a forfeiture and will not enforce one.[5]
Equity disregards all form and looks to the substance and essence of every matter. In the substance of a transaction that land is being used to secure debt it matters not the form of the transaction; both the creditor's and debtor's rights in and to the land are subject to adjudication only in equity proceedings based upon equitable principles. These equitable principles are codified in section 697.01(1), Florida Statutes, which provides as follows:
697.01 Instruments deemed mortgages. 
(1) All conveyances, obligations conditioned or defeasible, bills of sale or other instruments of writing conveying or selling property, either real or personal, for the purpose or with the intention of securing the payment of money, whether such instrument be from the debtor to the creditor or from the debtor to some third person in trust for the creditor, shall be deemed and held mortgages, and shall be subject to the same rules of foreclosure and to the same relations, restraints and forms as are prescribed in relation to mortgages.
It has often been explained[6] that a contract for deed wherein the seller agrees to convey title to land after the buyer pays all installments of the purchase price is merely a security device and is an alternative or substitute to an immediate conveyance of the title to the buyer with a purchase money mortgage back to the seller. Under equitable concepts, the buyer under the agreement for deed is in the same position as the purchaser-mortgagor and the seller is merely a lienor. Under the usual deed-mortgage sale arrangement, the buyer immediately receives and holds the legal title and the seller has a legal lien (mortgage) on the land; whereas under the land contract sale arrangement, the buyer immediately receives and holds the equitable title and the seller holds the bare legal title only as security for the unpaid purchase price. The form is different but the substance is the same for equitable purposes including the foreclosure procedure in the event the buyer defaults in payment of some portion of the purchase price.
An equity judgment may not, in a quiet title action, "cancel" a land contract buyer's equitable title or otherwise decree a forfeiture of the buyer-debtor's interest in land in favor of the seller-creditor. The land contract must be foreclosed in equity in the same manner as provided for foreclosure of mortgages[7] and the equitable title of the land contract buyer, like the legal title of a mortgagor, terminated by a judicial sale.
Like the legal mortgagor, the land contract buyer has an "equity of redemption" which is a right recognized in equity *836 to redeem his land from the consequences of default in payment of debt secured by the land, by fully paying the debt at any time before the judicial sale of the land becomes final.
The seller in this case has another problem. When a debt is by its terms payable in installments, the creditor has a cause of action for nonpayment of each installment only if, as, and when, default occurs as to that installment. To avoid a serial accrual of many small causes of action resulting from non payment of a series of installment payments, draftsmen trained in law usually place in instruments providing for installment payments an acceleration clause commonly providing that after a default in an installment and the lapse of some grace period, the creditor may elect an option to accelerate the entire debt.[8] Such clauses are especially important as to installment payment of debt secured by land and equity has developed strict rules relating to the procedure for the valid exercise of such acceleration clauses.[9]
There is evidence in the record that the buyers tendered full payment to the seller before this action was filed and again during trial but this is somewhat irrelevant because the contract for deed in this case contained no acceleration clause.
The final judgment "cancelling" the buyers' claims is reversed and the cause remanded for further proceedings consistent with this opinion.
REVERSED and REMANDED.
GRIFFIN, J., concurs.
ORFINGER, M., Associate Judge, concurs with opinion.
ORFINGER, M., Associate Judge, concurring.
I concur. It is obvious that the contract in question here is an installment contract, payable in semiannual installments over a period of years, and thus has all the characteristics of an agreement for deed. This type of arrangement has been traditionally treated as a security device and readily distinguishes this case from cases such as Williams v. Crouch, 186 So.2d 491 (Fla. 1966), Goldfarb v. Robertson, 82 So.2d 504 (Fla. 1955) and Beatty v. Flannery, 49 So.2d 81 (Fla. 1950).
NOTES
[1] Payment of $6,000 principal plus 12% interest would appear to require semiannual payments of $800 each commencing October 3, 1987 with a final payment of $211.80 on October 3, 1992.
[2] Although Count II alleges it is an action to foreclose on real property in the prayer to that count, the buyers demand "judgment removing the clouds from the title to their land and quieting title in the plaintiffs."
[3] See, generally, In re Estate of Mundell, 459 So.2d 358 (Fla. 5th DCA 1984), rev. denied, 467 So.2d 999 (Fla. 1985).
[4] See Hutchens v. Maxicenters, U.S.A., 541 So.2d 618 (Fla. 5th DCA 1988).
[5] Crawford v. Crawford, 129 Fla. 746, 176 So. 838 (1937); Purcell v. Williams, 511 So.2d 1080 (Fla. 1st DCA 1987); Mid-State Investment Corp. v. O'Steen, 133 So.2d 455 (Fla. 1st DCA), cert. denied, 136 So.2d 349 (Fla. 1961).
[6] Ricard v. Equitable Life Assurance Society, 462 So.2d 592 (Fla. 5th DCA 1985); Cain & Bultman, Inc. v. Miss Sam, Inc., 409 So.2d 114 (Fla. 5th DCA 1982); Purcell v. Williams; First Federal Savings & Loan Association v. Fox, 440 So.2d 652 (Fla. 2d DCA 1983); Ernest v. Carter, 368 So.2d 428 (Fla. 2d DCA 1979); Adkinson v. Nyberg, 344 So.2d 614 (Fla. 2d DCA 1977); Torcise v. Perez, 319 So.2d 41 (Fla. 3d DCA 1975); Hoffman v. Semet, 316 So.2d 649 (Fla. 4th DCA 1975); H & L Land Company v. Warner, 258 So.2d 293 (Fla. 2d DCA 1972); Mid-State Investment Corp. v. O'Steen.
[7] See § 697.01(1), Fla. Stat.
[8] Adkinson v. Nyberg, 344 So.2d 614 (Fla. 2d DCA 1977).
[9] See e.g., River Holding Company v. Nickel, 62 So.2d 702 (Fla. 1952); Parise v. Citizens National Bank, 438 So.2d 1020 (Fla. 5th DCA 1983); Bensman v. Deluca, 498 So.2d 645 (Fla. 4th DCA 1986); Yelen v. Bankers Trust Company, 476 So.2d 767 (Fla. 3d DCA 1985); Ernest v. Carter, 368 So.2d 428 (Fla. 2d DCA 1979).