J-A09032-24          2025 PA Super 114

| | | |
|---|---|---|
| JOHN T. ZANICKY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| PAULA SKOPOW | : | |
| | : | |
| Appellant | : | No. 1078 WDA 2023 |

Appeal from the Order Entered August 15, 2023
In the Court of Common Pleas of Venango County Civil Division at No(s):
Civ. No. 2020-968

BEFORE:  DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

OPINION BY KUNSELMAN, J.:                    **FILED: May 30, 2025**

## I.      Introduction

In this dispute over residential property, Paula Skopow appeals from the order granting partial summary judgment to John T. Zanicky, ejecting Ms. Skopow from the land, and dismissing her counterclaim for quiet title. Because we conclude that Ms. Skopow's installment land contract[1] constituted a mortgage on the property and the seller/mortgagee neglected to enforce the mortgage for over 20 years, we reverse the ejectment, discharge the mortgage, and remand for the entry of an order to transfer legal title to the property to Ms. Skopow.

## II.      Factual & Procedural Background

On March 15, 2000, James Emrick agreed to sell Ms. Skopow a piece of land in Venango County and the mobile home located on it for $25,000.  Ms.

---

[1] Installment land contracts are known by various names, including a contract for deed, a long-term land contract, a land-sale contract, and a rent-to-own contract.

Skopow made a down payment of $12,000 and agreed to pay the remaining $13,000 in monthly payments of $400. **See** Joint Stipulations of Fact at 3. They memorialized their contract in a writing that Mr. Emrick signed as "Seller" and Ms. Skopow signed as "Buyer."[2] *Id.* The first installment of $400 was due on April 5, 2000, and "a final monthly payment of $200 . . . would have been due December 5, 2002 . . . ." *Id.* at 4. Also, it is undisputed that Seller agreed to deed his legal title to Buyer upon payment of the last installment, although this term does not appear in the writing. *See id.* Heather Stover signed the instrument as witness, but the writing was not notarized.

Buyer immediately entered into possession of the property. While the writing did not address taxes, Buyer paid the taxes on the mobile home, and Seller paid the taxes on the real estate. Buyer paid the first four installments but defaulted on August 5, 2000. Instead of suing Buyer, Seller attempted to resell the property to Mr. Zanicky for $10,000 on December 7, 2000. Seller executed a deed to Mr. Zanicky for fee simple, which was recorded.

A week later, Buyer sued Seller and Mr. Zanicky to have the Seller-to-Zanicky Deed set aside as against Buyer's interest in the property based on Seller's contract with Buyer. Seller and Mr. Zanicky filed no counterclaims and offered only general denials to Buyer's complaint. These were deemed to be insufficient.[3] Therefore, on the day set for trial, the court granted Buyer

---

[2] Hereafter, we refer to Mr. Emrick and Ms. Skopow by the designations they selected for themselves in their contract: *i.e.*, "Seller" and "Buyer."

[3] Mr. Zanicky was *pro se*, and Seller failed to appear for trial.

summary judgment and set aside the Seller-to-Zanicky Deed. *See Skopow v. Emrick*, Civ. No. 2060-2000, 7/5/07 Order at 2 (C.C.P. Venango 2007). There was no appeal.

Buyer continued living on the property for the next several years. In 2013, she removed the mobile home and purchased a new one for $14,000. Buyer obtained title to the new mobile home from PennDOT, but she had never acquired title to the prior one. Seller did not object or take any legal action against Buyer for removing and replacing the original mobile home.

Seven years later, on August 14, 2020, for reasons not of record, Seller attempted to reconvey the property to Mr. Zanicky by a quitclaim deed. Seller simultaneously assigned his rights, titles, and interests under the contract to Mr. Zanicky (hereafter, "Assignee").

A month later, on September 4, 2020, Assignee's attorney sent a letter to Buyer, headed "NOTICE OF INTENTION TO FORECLOSE." Joint Stipulations of Fact, Ex. H at 1. The Notice of Foreclosure informed Buyer that Seller had assigned his rights under the contract to Assignee. *Id.*

According to Assignee, Buyer made no installment payments to Seller and therefore owed $13,000 on the purchase price, with 6% interest per year, for a total of $26,780. The Notice also said Buyer had "the right to cure the default on or before October 20, 2020, by sending a cashier's check" for $26,780 to Assignee. *Id.* Further, if Buyer failed to pay in full by that date, Assignee threatened to "accelerate the balance due and proceed to foreclose and/or pursue any other legal remedy allowed by law in [the trial court],

- 3 -

thereby divesting [Buyer] of title and possession of the premises." ***Id.*** Finally, the Notice advised Buyer of her rights under 41 P.S. § 404 (providing that any default in a "residential mortgage obligation" may be cured "at any time at least one hour prior to the commencement of bidding at a sheriff's sale" of the mortgagor's interest in the residence). ***See id.*** at 2.

Buyer refused to abandon the property or to pay Assignee.

On October 21, 2020 – *i.e.*, over 20 years after Buyer initially defaulted – Assignee sued Buyer and raised two counts. First, he sought to eject Buyer from the property, including the new mobile home she purchased and affixed to the land, and to have the March 15, 2000 contract voided. In his second count, Assignee sought to have the contract enforced and claimed Buyer owed him $13,000 on the original purchase price, plus $13,845 in interest.

In her operable, amended Answer, Buyer raised affirmative defenses, including a claim that the statute of limitations on her default was four years. She also brought a counterclaim to have Assignee execute a deed to her in fee-simple title to the property by general-warranty deed. Essentially, Buyer filed a counterclaim for quiet title.

Buyer moved for judgment on the pleadings. She argued that Seller's cause of action accrued when Buyer first defaulted, in August of 2000, or, at the very latest, when her final installment payment was due (*i.e.*, December 5, 2002). She contended that, under Pennsylvania case law, installment land contracts are mortgages and the statute of limitations for this mortgage was four years. Hence, Assignee's claims were time barred.

The trial court ruled "the applicable statute of limitations is 21 years, and that, while the March 15, 20[0]0 'document' is treated procedurally as a mortgage for the protection of the borrower, it is not a mortgage as defined by the law in Pennsylvania." T.C.O., 2/10/23. Thus, it denied Buyer's motion.

Eventually, both parties moved for summary judgment, agreed there was no genuine issue of material fact, and filed Joint Stipulations of Facts. Assignee sought possession of the property and removal of Buyer; the voiding of the contract; and damages for the remainder of the purchase price and interest. Buyer sought either (1) an order directing Assignee to transfer title to her or (2) a declaration that the statute of limitations expired, thereby extinguishing the mortgage and entitling Buyer to legal title.

On August 14, 2023, the trial court issued an opinion granting partial summary judgment to both parties. Reiterating its prior holding that the statute of limitations was 21 years, the court held that the contract between Seller and Buyer was "not a mortgage as it is incapable of being recorded, as required for all mortgages." Trial Court Opinion, 10/14/23, at 2. Notably, the trial court cited no case or statute to support that contention. Also, despite holding that the statute of limitations was 21 years, the court then granted summary judgment to Buyer on Assignee's claim for the remainder of the purchase price and interest based on a four-year statute of limitations for breach-of-contract actions. ***See id.***

The court opined that, "although neither party has focused on an 'equity' argument, the court has considered the various equities between the parties,

- 5 -

and the unique and extended duration of this relationship, and finds that [Buyer] has received a considerable benefit for her initial payment and several subsequent monthly installments." *Id.* "No hardship is being visited upon she who has lived rent-free and tax-free, since the millennium." *Id.* It also believed that Buyer possessed the property "without a lease, a license, permission or title of any kind . . . ." *Id.*

In the trial court's view, the parties were stuck in a legal stalemate, where Buyer "would continue to possess, without contribution of any kind, but could not encumber or transfer the title, [and Assignee] would continue to own the property, but neither he, nor any future owners, could possess the land." *Id.* "Without the granting of ejectment in favor of [Assignee], these parties would be frozen in place in this 'no man's land' into perpetuity." *Id.* at 2-3.

The trial court therefore granted summary judgment to Assignee for ejectment and denied summary judgment to Buyer on her counterclaim. Thus, the court awarded ownership and possession of the property and mobile home to Assignee, but it did not award him damages. Buyer timely appealed.[4]

### III. Analysis

Buyer raises five issues as follows:

1. Is the contract at issue in this case an installment land contract?

---

[4] Mr. Zanicky has not cross-appealed the portion of the order that denied his claim for damages.

2. Is an installment land contract a constructive mortgage, under which the seller retains legal title solely as security for a debt?

3. Does Pennsylvania's four-year limitation on contract actions bar [Assignee's] action to enforce the debt and constructive mortgage under [Seller's] installment land contract, an action commenced over 20 years after [Buyer] stopped making monthly payments, and nearly 18 years after the final payment was due?

4. If the statute of limitations bars enforcement of the debt and constructive mortgage, is the constructive mortgage discharged, the interest of [Assignee] extinguished, and [Buyer] entitled to a judgment of quiet title?

5. Even if the action were not barred by the statute of limitations, could [Assignee] extinguish [Buyer's] equitable title by obtaining an order in ejectment?

Buyer's Brief at 3. We address each issue in turn.

*A.    The Type of Contract*

First, Buyer asserts that, on March 15, 2000, she and Seller entered into an installment land contract. Buyer recites the definition of an installment land contract found in **Anderson Contracting Co. v. Daugherty**, 417 A.2d 1227 (Pa. Super. 1979). She then says that definition "describes exactly what happened in this case," and, therefore, the writing that she and Seller signed was "an installment land contract as described in **Anderson**." Buyer's Brief at 7.

Assignee does not challenge Buyer's claim that Buyer and Seller entered an installment land contract. Instead, Assignee attempts to preempt Buyer's subsequent argument on her other appellate issues.

First, Assignee contends the issue of whether Seller and Buyer formed an installment land contract is "irrelevant." Assignee's Brief at 11. He claims the writing, wherein Seller and Buyer memorized their agreement, is incapable of being recorded. Therefore, like the trial court, he believes it cannot be a mortgage. In this regard, Assignee relies upon the Pennsylvania Residential Mortgage Act, 41 P.S. §§ 101-605. *See id.* at 12.

Second, Assignee responds that Buyer waived her appellate issues by not filing a preliminary objection in the nature of a demurrer to his count for ejectment. He cites no rule or case to support his claim of waiver, but merely states that Buyer "waived any objection to [Assignee's] filing and proceeding under an ejectment action." *Id.* at 13.

Third, Assignee says, even if the agreement is an installment land contract and the contract constitutes a mortgage, he may still bring his action for ejectment, because historically mortgagees could maintain actions for ejectment against mortgagors in Pennsylvania. *See id.* (citing LANDER PENNSYLVANIA REAL ESTATE LAW, 6th Ed. (2013) § 27.01 at 27-01). He therefore asserts that he "was still entitled to bring an ejectment action, even if the [writing] constituted a mortgage." *Id.*

Fourth, Assignee turns to the trial court's determination that failing to eject Buyer would create an absurd result. In his mind, if ejectment is not granted, Buyer would continue to live on the land, even though Assignee would continue to hold legal title. *See id.* at 14.

Fifth, because he thinks he rightfully holds legal title, Assignee contends he properly brought an action for ejectment, given that he is out of possession. Assignee observes that an action for ejectment has a 21-year statute of limitations. Hence, he purports to have timely filed his action for ejectment.

Finally, Assignee paradoxically asserts that **Anderson**, **supra**, "actually supports [his] position, even though **Anderson** has nothing to do with the present situation or the statute of limitations." **Id.** at 15. He claims that the **Anderson** Court limited its decision to treat installment land contracts as mortgages to instances where those contracts are capable of being recorded.[5]

Before reviewing Buyer's first claim of error, we pause to consider Assignee's claim that Buyer waived her appellate issues by failing to file a preliminary objection to his ejectment count. "The issue of waiver presents a question of law, and, as such, our standard of review is *de novo*, and our scope of review is plenary." **Trigg v. Children's Hospital of Pittsburgh of UPMC**, 229 A.3d 260, 269 (Pa. 2020).

According to Assignee, Buyer committed waiver by not filing preliminary objections in the nature of a demurrer to the ejectment count in his complaint. As mentioned, Assignee cites no rule or case that so holds, and our research has revealed none.

The Pennsylvania Rules of Appellate Procedure require only that issues be raised in the trial court to preserve them for appellate review; in other

---

[5] Rather than discussing each of Assignee's claims now, we address them individually when they are germane to our analysis below.

words, issues generally cannot be raised for the first time on appeal. ***See*** Pa.R.A.P. 302(a). That said, Rule 302(a) does not require an issue be raised at any particular time or in any particular motion to preserve it for appeal.

Here, Buyer repeatedly raised her theories regarding the nature of the contract she formed with Seller and the four-year statute of limitations. She initially brought these theories to the trial court's attention in her Amended Answer and New Matter. She also moved for judgment on the pleadings based on those theories. Furthermore, Buyer reasserted them in her motion for summary judgment. Thus, she has not waived either theory under Rule of Appellate Procedure 302(a).

Nevertheless, some Rules of Civil Procedure demand that steps be taken to raise certain issues at certain times in the trial court, and failure to do so results in waiver. For example, Pa.R.C.P. 1030 mandates that "all affirmative defenses including but not limited to the defenses of . . . statute of limitations . . . ***shall*** be pleaded in a responsive pleading under the heading 'New Matter.'" Pa.R.C.P. 1030(a) (emphasis added). By contrast, other rules are less demanding. For example, Rule 1028, governing preliminary objections, is permissive. "Preliminary objections ***may*** be filed by any party to any pleading [and include] legal insufficiency of a pleading (demurrer) . . . ." Pa.R.C.P. 1028(a)(4) (emphasis added).

By including her statute-of-limitations defense in her New Matter, Buyer complied with Rule 1030. Furthermore, based on the clearly permissive language of Rule 1028(a)(4), she was under no obligation to file a preliminary

objection in the nature of a demurrer to preserve her issues for appellate review. Assignee's claim of wavier is unavailing.

Buyer's first appellate issue challenges the grant of summary judgment to Assignee on his claim for ejectment, on the grounds that Buyer entered an installment land contract with Seller. Her assertion is correct.

When reviewing a grant or denial of summary judgment, this Court's "inquiry involves solely questions of law," and, as such, our standard of review is *de novo*. ***Caterpillar Financial Services Corp. v. Get 'Er Done Drilling, Inc.***, 286 A.3d 302, 306 (Pa. Super. 2022). "The entry of summary judgment is proper whenever no genuine issue of any material fact exists as to a necessary element of the cause of action." ***LJL Transportation, Inc. v. Pilot Air Freight Corp.***, 962 A.2d 639, 647 (Pa. 2009). "The moving party's right to summary judgment must be clear and free from doubt." ***Id.***

This Court's scope of review is plenary. ***See id.*** However, like the trial court, we must view the evidence in the "light most favorable to the non-moving party, and we resolve all doubts as to the existence of a genuine issue of material fact against the moving party." ***Id.*** Because this issue concerns whether the trial court properly granted summary judgment to Assignee for ejectment, we view the facts in the light most favorable to Buyer.

Under Pennsylvania law, parties form an installment land contract when a buyer of real property "takes possession and makes periodic installment payments until the balance of the contract price is paid" to the seller.

*Anderson*, 417 A.2d at 1231. "Legal title to the property is, however, retained by the [seller] until the terms of the contract are satisfied." *Id.*

Installment land contracts differ from sales agreements, a.k.a. "earnest-money contracts." Most notably, an installment land contract serves as both the agreement under which title is intended to pass, as well as a financing agreement between the buyer and the seller. "Installment land contracts provide a type of [seller] financing for [buyers] . . . so that [buyers] need not seek financing from a third-party mortgage lender." POWELL ON REAL PROPERTY § 84D.01[2] (Michael Allan Wolk ed., LexisNexis Matthew Bender, 2006).

There is also a clear difference in contract duration. "Under the usual contract for the purchase of land, the time between the signing of the contract and the closing, where the buyer obtains a deed, is relatively short." Gray, 15 WEST'S PA. PRACTICE, MORTGAGES § 1:5 (3d ed.). The property remains under an earnest-money contract for "usually only a month or two." Grant S. Nelson & Dale A. Whitman, *Installment Land Contracts — The National Scene Revisited*, 1985 BYU L. Rev. 1, 4 (1985). "While the earnest-money contract is completed at closing when [buyer] either tenders the full purchase price or enters into a separate security agreement, the installment land contract governs the parties throughout the life of the debt." *Id.* Thus, a hallmark of installment land contracts is that "the closing will often occur years in the future after the full purchase price has been fully paid. In the meantime, the seller will have been receiving payments that are very similar to periodic mortgage payments." Gray, *supra*.

- 12 -

In this case, Buyer and Seller entered into an agreement for Buyer to purchase and for Seller to sell the property and the mobile home that was on the land. Buyer made an initial downpayment of $12,000 and agreed to make monthly installment payments of $400. Therefore, Seller agreed to finance the remainder of the purchase price for Buyer.

Furthermore, the parties had no intention of closing within a month or two. They entered the agreement on March 15, 2000 and planned to close two-and-a-half years later, on December 5, 2002, when Seller would deliver to Buyer a deed for the fee simple. Moreover, Buyer immediately entered into possession of the property and has remained in possession ever since. The fact that she later defaulted on her installment payments has no bearing on the nature of the contract that Seller and Buyer formed.

Thus, this transaction satisfies all the major elements of an installment land contract. The handwritten instrument memorializing their agreement, along with the other stipulated facts, clearly and undoubtedly establish that Seller and Buyer entered into an installment land contract, rather than an earnest-money contract (or any other form of agreement, such as a lease).

To the extent the trial court viewed the writing and the contract it memorialized as anything other than an installment land contract, the trial court erred as a matter of law.

B.    *The Installment Land Contract as Mortgage*

As her second claim of error, Buyer argues that the trial court incorrectly ruled that the installment land contract was not a mortgage. She contends

that, in **Anderson**, **supra**, this Court held that a land installment contract "is to be construed and enforced as if it were a mortgage."  Buyer's Brief at 7. After extensively quoting **Anderson**, Buyer acknowledges that a subsequent panel of this Court said, "the **Anderson** Court expressly limited the scope of its decision to the purposes of Act No. 6."  **Id.** at 8-9 (quoting **New Home Federal Savings & Loan Association v. Trunk**, 482 A.2d 625, 630 (Pa. Super. 1984), *disapproved of on other grounds by* **Marra v. Stocker**, 615 A.2d 326 (Pa. 1992)).

Nevertheless, Buyer indicates that, in the 40 years since **Trunk**, other Pennsylvania appellate decisions have relied upon **Anderson** for the broader proposition that an installment land contract constitutes a mortgage.  Finally, she explains that the modern trend in property law is to construe installment land contracts as a full-fledged mortgages.  This trend culminated in the RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) endorsing that approach.  In Buyer's view, Section 3.4 of the RESTATEMENT accurately encapsulates the law of this Commonwealth.  **See id.** at 9-10.

Assignee replies that **Anderson** held "the security document must be capable of being recorded for it to qualify as a mortgage."  Assignee's Brief at 17.  He argues that, even if an installment land contract is a mortgage, he (a mortgagee) may still eject Buyer (a defaulting mortgagor) from the property.

Thus, Assignee believes he properly filed his ejectment action within the 21 years of Buyer's default on a mortgage. **See id.**[6]

Published in 1997, the RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) represents the American Law Institute's first treatise on "transactions in which real property is employed as security for some obligation." RESTATEMENT THIRD, PROPERTY (MORTGAGES) at 3. The authors of that treatise describe the omission of mortgages from the First and Second Restatements as follows:

> The American Law Institute has never previously adopted a Restatement of the law of real-property security. This seems surprising in light of the obvious importance of this body of law. Several factors may explain it. One is the heavy statutory control of the law in most jurisdictions. Another is the degree of variation in court-made legal rules from one state to another, particularly with respect to such mortgage substitutes as installment land contracts and absolute deeds.
>
> This lack of uniformity may have been only a minor inconvenience in an early era: today it is a serious obstacle to the nation's economic well-being. The reason is the vast expansion in the flow of funds across state lines for real-estate-financing purposes.

RESTATEMENT THIRD, PROPERTY (MORTGAGES) at 3.

Due to the nationalization of the mortgage market in the latter half of the 20th century, the American Law Institute saw a need to restate the law of mortgages. In doing so, it hoped "to assist in unifying the law of real-property security by identifying and articulating legal rules that will meet the legitimate

---

[6] Our scope and standard of review are the same for this issue as Buyer's first issue, and we incorporate them by reference.

needs of the lending industry while at the same time providing reasonable protections for borrowers." *Id.*

Regarding installment land contracts, Section 3.4 of the RESTATEMENT provides:

> (a)  A contract for deed [a.k.a. an installment land contract] is a contract for the purchase and sale of real estate under which the purchaser acquires the immediate right of possession of the real estate and the vendor defers delivery of a deed until a later time to secure all or part of the purchase price.
>
> (b)  A contract for deed creates a mortgage.

*Id.* at 154.  As explained below, the history of installment land contracts, scholarly criticism of them, and judicial trends in Pennsylvania and across the country convince this Court that Section 3.4 of the RESTATEMENT (THIRD) accurately reflects Pennsylvania law.

Installment land contracts debuted in the late 1800s, when the railroad companies began selling off their excess property.  *See* N. William Hines, *Forfeiture of Installment Land Contracts*, 12 U. Kan. L. Rev. 475, 476 (1964). At their core, these contracts contained strict forfeiture clauses.  *See, e.g.*, **Cape May Real Estate Co. v. Henderson**, 42 Pa. Super. 1, 3 (1910) (*en banc*), *affirmed*, 79 A. 982 (Pa. 1911) (presuming "that the forfeiture clause is for the benefit of the [seller] and enforceable at his election.").

If buyers missed a payment, the forfeiture clause allowed sellers to sue and thereby terminate the contract, eject buyers from the property, and retain all made payments as liquidated damages.  Hence, the contracts operated

exactly like the mortgages of Medieval England prior to the court of equity intervening and creating the right of redemption.[7]  If buyers defaulted on a date certain – what common-law mortgages called "law day" – buyers lost the property, the costs of any improvements they had made, and all installment payments on the purchase price.

According to the Professor Nelson, one of the two Reporters for the RESTATEMENT (THIRD), in the middle to late 1800s, the "freedom-of-contract perspective and its related *laissez faire* economic philosophies were making substantial impact on American jurisprudence."  Grant S. Nelson, *The Contract for Deed as a Mortgage:  The Case for the RESTATEMENT Approach*, 1998 BYU L. Rev. 1111, 1114-15 (1998).  Thus, courts of this period were quite willing to enforce the forfeiture clauses as written.  ***See id.***

Use of installment land contracts increased during the Great Depression when "lending institutions used [them] to resell land they took through the

---

[7] Mortgages at common law were executed by a deed, wherein the debtor on loan (the mortgagor) granted conditional fee in the property to the creditor (the mortgagee) to secure a loan.  The deed was "a feoffment subject to a condition that, on payment by the debtor of a sum named, at a certain time, [the debtor] might reenter, thereby terminating the [creditor's] estate." Tiffany, 5 THE LAW OF REAL PROPERTY § 1379 at 229 (1939).  The law courts insisted that debtors strictly comply with the condition to pay on the date certain.  Courts of law refused to view the deed with a condition subsequent for what it was really "intended, merely as security for a debt . . . ."  ***Id.*** Hence, by law, the estate deeded to the creditor became "indefeasible if the condition was not promptly performed by the mortgagor.  Consequently, land was often forfeited for a debt much less than its value."  ***Id.  See also***, *id.* at 234-37 (regarding equity of redemption and early attempts by creditors to clog debtors' equity).

foreclosure process." Caelin Moriarity Miltko, *What Shall I Give My Children?": Installment Land Contracts, Homeownership, and the Unexamined Costs of the American Dream*, 87:2029 U. Chi. L. Rev. 2273, 2282 (2020). They became even more popular after World War II. ***See id.*** Installment land contracts served "as a replacement financing device for those who [did not] qualify for traditional mortgages and thus [were] more likely to agree to riskier contracts." ***Id.*** at 2282-83.

In the 1950s, the installment land contract "gained prominence in urban centers as a result of discrimination by both private and government actors." ***Id.*** at 2283. This arose from the Federal Housing Administration's redlining policy, which allowed lenders to discriminate against minority neighborhoods. ***See id.*** at 2283-86. "Sellers stepped into the gap, offering seller-financed installment land contracts with predatory terms." ***Id.*** at 2286.

Because courts did not view the contracts as either leases or mortgages, buyers received the worst of both worlds. Like a lease, buyers had to make monthly payments but acquired no equity in the property, and sellers could promptly remove them by an ejectment action under the forfeiture clause. Like a mortgage, sellers were under no obligation to make the home habitable or to perform any repairs. When buyers defaulted and were ejected from the property, sellers soon "resold the home on [another installment land] contract, starting the cycle again." ***Id.*** "The end result was huge windfalls for those who 'sold' houses via installment land contracts and devastating, long-lasting effects for the neighborhoods deemed undesirable." ***Id.*** As a result, the land

- 18 -

installment contract "stripped wealth from African-American communities and led to debt peonage or impoverishment for many black contract buyers, and decay of the communities in which such sales were concentrated." Jeremiah Battle, Jr. *et al.*, *Toxic Transactions: How Land Installment Contracts Once Again Threaten Communities of Color* at 6 (2016), available at https://www.nclc.org/wp-content/uploads/2022/09/report-land-contracts.pdf (last visited 12/31/24) (some punctuation omitted).

Unsurprisingly, installment land contracts fell under public and scholarly criticism during the Civil Rights Era. This lead to both legislative regulation of their use[8] and a judicial reevaluation of their forfeiture clauses. To blunt the forfeiture clauses, a "growing number of courts explicitly or implicitly recognized that [the defaulting buyer] has the functional equivalent of a mortgagor's equity of redemption." Nelson, *The Contract . . .* at 1121. These courts allowed the buyer to make up the late payments and thereby reinstate or payoff the contract. However, if the buyer could not afford to do so, this approach did not give the buyer "the right to compel foreclosure of the contract." *Id.*

Those courts, which still permitted forfeiture, began negating the unjust result of allowing sellers to retain any payments as liquidated damages.

---

[8] In 1965, for example, the General Assembly of Pennsylvania enacted the Installment Land Contract Law, 68 P.S. §§ 901-911. This act provided buyers some protections afforded to traditional mortgagors; however, it was limited in scope to first and second class counties (*i.e.*, Philadelphia and Allegheny Counties). *See* 68 P.S. § 903(a)(1).

Instead, such courts gave defaulting buyers a restitution remedy "to recoup the contract payments to the extent that they exceed the damages" that sellers suffered. *Id.*

Finally, other courts took "the next logical step and largely concluded that [installment land contracts] must be governed both procedurally and substantively by the law of mortgages." *Id.* at 1125. Under this theory, the defaulting buyer secured the right "to have the value of the land tested at a public foreclosure sale." *Id.* (quoting the RESTATEMENT, PROPERTY (MORTGAGES) § 3.4 cmt. b(3)). The leading case adopting the installment-land-contracts-as-mortgages approach is *Skendzel v. Marshall*, 301 N.E.2d 641 (Ind. 1973); *see also White v. Brousseau*, 566 So.2d 832 (Fla. App. 5ᵗʰ 1990); *Bean v. Walker*, 95 A.D.2d 70, 74, 464 N.Y.S.2d 895 (1983); *Sebastian v. Floyd*, 585 S.W.2d 381 (Ky. 1979). This is the approach of the RESTATEMENT (THIRD).

Jurisdictions that follow the RESTATEMENT approach do so based upon the realities of the transaction: *i.e.*, an installment land contract is a land-security device for sellers' long-term loans to buyers. *See* Gray, *supra*. Installment land contracts place the seller and buyer in the same position as mortgagee and mortgagor. In fact, the "installment land contract has been described as a poor person's mortgage." *Id.* "If a borrower does not have a large enough down payment to obtain conventional mortgage financing, he or she can frequently purchase real property with a small down payment under a long-term installment contract." *Id.* The same is true for borrowers with a poor

- 20 -

or no credit history. The seller functions as both seller and lender of the remainder of the purchase price. The seller is the buyer's mortgagee.

"There can be no sensible distinction between the case of a legal title conveyed to secure the payment of a debt and a legal title retained to secure such payment." Richard H. Lee, *The Interests Created by the Installment Land Contract*, 19 U. Miami L. Rev. 367, 375 (1965). In other words, the actual relationship of the parties to an installment land contract is that of mortgagor and mortgagee. ***See Anderson***, ***supra***.

This result comports with the equitable conversion of real estate that occurs when a sales contract is entered. The court of "equity considers lands directed in . . . instruments to be sold and converted into money, as money; and money directed to be employed in the purchase of land, as land." ***Burr v. Sim***, 1 Whart. 252, 262, 1836 WL 3112, at *9 (Pa. 1836). "The doctrine of conversion . . . is founded on the equity maxim, that what is properly and sufficiently directed to be done, is in equity, considered as done." ***Id.*** Hence, "the moment an agreement of sale is executed and delivered it vests in the [buyer] what is known as an equitable title to the real estate." ***In re Highberger's Estate***, 360 A.2d 580, 584 (Pa. 1976). The buyer becomes the equitable owner of the property, despite the seller still holding legal title.

Therefore, when the trial court in this case opined that Buyer possessed the property "without a lease, a license, permission or ***title of any kind***," it erroneously failed to apply the doctrine of equitable conversion. Trial Court Opinion, 10/14/23, at 3 (emphasis added). When Seller signed the

installment land contract, Buyer acquired **equitable title**, which she retained thereafter. Consequently, Seller retained legal title only as a security interest. "Upon execution and delivery of the agreement of sale, the [seller's] interest becomes personal property and is to be administered as such, although he (or his estate) is regarded as still holding the legal title to the real estate as security for payment of the purchase price." **Highberger**, 360 A.2d at 585. "Retention of title by the [seller] serves as security for the [buyer's] performance of the contract. In essence, then, a [seller] who retains title has an interest which, although strictly speaking is not a lien, may be enforced as though it were." **Anderson**, 417 A.2d at 1231.

A purchase-money mortgage creates an identical relationship between traditional mortgagor and mortgagee, albeit in different legal forms. The traditional mortgagor promises to repay the loan in regular installments, over the course of many years, while simultaneously offering the property as security for the loan. The "mortgage does not transfer title to the mortgagee; rather, it constitutes a lien on the mortgagor's interest, thereby securing the mortgagee's loan." **General Credit Co. v. Cleck**, 609 A.2d 553, 557 (Pa. Super. 1992). The only distinction between a traditional mortgage and an installment land contract is that, in the former case, the mortgagee has a lien on the property, while, in the latter case, the seller retains title as a security interest that functions as a lien on the property. This is a distinction without a difference.

"Conceptually, therefore, the retention of the title by the vendor is the same as reserving a lien or mortgage." *Skendzel*, 301 N.E.2d at 646. "Realistically, vendor-vendee should be viewed as mortgagee-mortgagor. To conceive of the relationship in different terms is to pay homage to form over substance." *Id.* In *Anderson*, this Court adopted the view of the Supreme Court of Indiana as persuasive. Admittedly, we did so when deciding whether installment land contracts met the definitions of certain terms in Act No. 6, but in doing so, we extensively analogized such contracts to mortgages.

Moreover, the Supreme Court of Indiana did not limit its application of *Skendzel* to one statute. Nor has any subsequent appellate case in Indiana done so, and *Skendzel* was "reflective of the current trend in this country." *Anderson*, 417 A.2d at 1232.

That trend has only continued in the 50 years since *Anderson*. For instance, relying in part on *Anderson* and Gray, *supra*, the Supreme Court of Pennsylvania, when explaining why a tenant did not acquire equity in leased property, equated installment land contracts to mortgages. The High Court said, a tenant "never acquired any 'equity' interest in the leasehold property in the way that a purchaser under a mortgage or *an installment land sales contract* does." *Goodwin v. Rodriguez*, 554 A.2d 6, 8 (Pa. 1989) (emphasis added). "By making periodic payments on a mortgage or installment contract, the purchaser may be said to gradually acquire the fee as he or she pays off the 'mortgage' loan." *Id.* Hence, the Supreme Court in *Goodwin* recognized

the similarities between a traditional mortgage and installment land contract, and the buyer's accumulation of equity under both instruments.

Additionally, this Court has held that the substantial similarities between a traditional mortgage and an installment land contract absolve sellers under an installment land contract from premise liablity. In **Welz v. Wong**, 605 A.2d 368, 369 (Pa. Super. 1992), plaintiff – a business invitee – fell at a sports bar and sued. Her complaint alleged that the Wongs were the record owners of the bar but were also sellers of the bar under an installment land contract. Thus, the Wongs only held title as a security interest until the buyers (also named defendants in the suit) made all installment payments.

Plaintiff contended the Wongs, as record title holders, should be treated as landlords, which would impose a duty upon them to maintain the premises. This Court rejected that claim.

We said, "It is true that the seller of land by an installment contract, who retains title pending full payment of the sales price, has a greater interest in the property than an individual who passes title at the time of sale. However, that interest is entirely contingent and often remote." **Id.** at 372. "The retained rights will vest only if another party out of the seller's control fails to meet the terms of the contract. In this scenario, the seller is filling the shoes of both seller **and mortgagee.**" **Id.** (emphasis added). We therefore treated the sellers under the installment land contract as mortgagees and imposed no duty upon them.

More recently, the Commonwealth Court extrapolated from **Anderson**, that "Pennsylvania case law states that an installment sale agreement should be treated as a mortgage." **Stillwater Lakes Civic Assoc., Inc. v. Krawitz**, 772 A.2d 118, 120–21 (Pa. Cmwlth. 2001). There, the owner of a residential-development home entered into an installment land contract, and the buyers took possession of the property. The HOA's dues, assessments, and sewerage fees went unpaid while buyers were in possession, and the association sued seller. The trial court ruled in favor of the HOA.

Based on its interpretation of **Anderson** and by holding that installment land contracts constitute mortgages in Pennsylvania, the Commonwealth Court reversed the award to the HOA. "Indeed, Pennsylvania has adopted a view stating that the relationship between a seller and a buyer who are parties to an installment sale agreement is that of mortgagee and mortgagor." **Stillwater Lakes**, 772 A.2d at 121 n. 2 (indicating that the RESTATEMENT (THIRD) § 3.4 comports with Pennsylvania law in that it treats installment land contracts as mortgages in all respects). The Commonwealth Court held that the seller's "interest in [the home] during the period [of buyer's possession] was solely as security for an obligation; [the seller] was not a 'unit owner' during that period." **Id.** at 121. Because seller was in reality "mortgagee for the period from July 25, 1994 to September 5, 1998, the [HOA had] no legal authority for collecting assessments from [him] for that period." **Id.**

As in **Welz**, **supra**, the out-of-possession seller in **Stillwater Lakes** had no liability in the property, because the law of this Commonwealth

deemed him mortgagee, rather than the homeowner. We agree with the Commonwealth Court's holding in **Stillwater Lakes**, **supra**, that an installment land contract "creates a mortgage." RESTATEMENT THIRD, PROPERTY (MORTGAGES) § 3.4(b). Additionally, the United States Court of Appeals for the Third Circuit has reached the same conclusion. **See, e.g.**, **In re Peralta**, 48 F.4th 178, 179 (3d Cir. 2022) (stating, "Rather than taking out a mortgage, homebuyers can pay the seller in installments. In Pennsylvania, these installment contracts are treated like mortgages.")

Assignee does not believe such a result is possible. He suggests that, because the writing that Seller and Buyer signed is not notarized, it may not be recorded. As a result of the writing not being recordable, Assignee claims that it does not constitute a mortgage. He is incorrect.

Certainly, failure to record a mortgage affects its priority to subsequent mortgages and its application to subsequent *bona fide* purchasers by statute. However, between mortgagor and mortgagee, statutes "have been regarded, almost universally, as not rendering the recording of a mortgage instrument as necessary to its validity." Tiffany, 5 REAL PROPERTY § 1391 (1939). The Supreme Court of Pennsylvania has said, "failure to record [an instrument is] not dispositive of whether [the instrument] effectuated a valid conveyance." **In re Estate of Plance**, 175 A.3d 249, 266 (Pa. 2017). Indeed, "it has been held that an unrecorded mortgage is not wholly inoperative. It will avail against the mortgagor himself, or his alienee, or mortgagee with notice . . . ."

***Appeal of Nice***, 54 Pa. 200, 201, 1867 WL 7443 at \*2 (1867). Hence, an unrecorded mortgage is operable against anyone with notice of it.

The trial court's refusal to give the installment land contract the effect of a mortgage due to its inability to be recorded was incorrect. Lack of recordability had no effect on the contract's validity as a mortgage between Buyer and Seller. Moreover, Assignee does not claim to be a subsequent *bona fide* purchaser who took his quitclaim deed without notice of Buyer's contract with Seller or her equitable title to the property. Nor could Assignee so claim, because Buyer sued him to defend her interest in the property in December of 2000, when Assignee first acquired a now-voided deed from Seller. ***See Skopow***, ***supra***.

In addition, extending the full equitable protections, including the right of mortgagors to insist upon a judicial foreclosure sale, to buyers under installment land contracts will reduce abusive and predatory lending practices in this Commonwealth that have historically surrounded such transactions. As mentioned above, the installment land contract has often been used to take advantage of lower-income borrowers and minority communities. ***See***, ***e.g.***, Battle, ***supra***; ***see also***, Stacy Purcell, *The Current Predatory Nature of Land Contracts and How to Implement Reforms*, 93 Notre Dame L. Rev. 1771 (2018).

Installment land contracts are often "built to fail, as sellers make more money by finding a way to cancel the contract so as to churn many successive would-be homeowners through the property." Battle, at 2. "Homeownership

through these deals was often a mirage, and buyers lost their homes, their down payments, their sweat equity, and the money they paid for repairs, maintenance, insurance, and interest." *Id.* The use of such contracts in this manner ballooned after the housing-market collapse and Great Recession of 2008. *See* Purcell, *supra*. Trading in these devices has since shifted to a big business with large, corporate lenders acquiring thousands of homes across the country to resell through installment land contracts. *See* Battle, *supra*.

By regarding these transactions as mortgages, the RESTATEMENT (THIRD) OF PROPERTY (MORTGAGES) allows equity to eliminate forfeitures of buyers' interests in homes that occurred, under strict law, upon default. Like any other mortgagors, buyers in an installment land contract have the rights to cure their default or to redeem their equity in the property. Failing those remedies, buyers have the right to insist upon a judicial-foreclosure sale, and to retain any profits beyond the cost of paying off the debt to the seller.

"Thus, [a seller] may not summarily dispossess [a buyer] of [buyer's] equitable ownership without first bringing an action to foreclose [the buyer's] equity of redemption." *Bean*, 95 A.D.2d at 74. "[A seller] may not enforce his rights by the simple expedient of an action in ejectment but must instead proceed to foreclose [a buyer's] equitable title or bring an action at law for the purchase price, neither of which remedies [seller] sought." *Id.*

Here, the trial court's refusal to treat the installment land contract as a mortgage, both substantively and procedurally, was incorrect. The trial court forced Buyer to forfeit her equity in the property, which included the $12,000

downpayment, four installments of $400, the $14,000 new mobile home she purchased for the property, and any increase in the value of the property over the last 20 years. "Equity, it has been said, abhors a forfeiture and is greatly hesitant to enforce one." ***Kalina v. Eckert***, 497 A.2d 1384, 1385 (Pa. Super. 1985).

Assignee could only extinguish Buyer's equity in the property by an action for foreclosure, which he did not file. Assignee contends that an action for ejectment remains an option for a mortgagee. This is partially true, but ejectment by a mortgagee does not produce the result that Assignee seeks or that the trial court granted.

"Actions of ejectment serve two distinct primary functions in connection with Pennsylvania mortgage law." Gray, MORTGAGES § 7:2. First, they allow the mortgagee to take possession of the property while a mortgagor is in default. Second, they allow the purchaser in the foreclosure sale to remove the mortgagor from the property. So, the mortgagee's ejectment action is "not really a substitute for foreclosure at all." ***Id.*** A mortgagee "can secure possession through the action of ejectment. However, the borrower might still be able to cure the default and reinstate the mortgage; hence, the lender will eventually have to foreclose and may do so, even if it has also brought an action of ejectment." ***Id.*** In other words, a mortgagee cannot "extinguish the equity of redemption, by his recovery [of possession] in ejectment;" the mortgagee must also commence a foreclosure action. ***Smith v. Shuler***, 12 Serg. & Rawle 240, 242, 1824 WL 2453, at *2 (Pa. 1824).

Assignee brought an action in ejectment but no action for foreclosure. Based on the relief he sought (possession and legal title, unencumbered by Buyer's equitable title), it was the wrong type of ejectment action for a mortgagee to bring. Assignee sought unencumbered title, because he believed that Buyer forfeited all of her rights to the property upon default. As explained, no forfeiture of Buyer's equitable title occurred.

Thus, Buyer is correct in her assertion that, in order to extinguish her equity in the property, Assignee needed to bring an action to foreclose her equity of redemption, because an installment land contract is a mortgage for all substantive and procedural purposes. Assignee's action for ejectment to establish an unencumbered title in himself does not lie.

Buyer's second appellate issue is meritorious.

C.    *Statute of Limitations for Mortgage Foreclosure*

Next, Buyer claims that the trial court erroneously granted summary judgment in favor of Assignee, because Seller needed to commence a mortgage-foreclosure action against Buyer within four years of when she defaulted on her installment payments. Buyer contends that, where, as here, the instrument evidencing the mortgage is not under seal, the statute of limitations is four years.

In response, Assignee argues that there is no statute of limitations for an action for mortgage foreclosure. He primarily relies upon *Corn v. Wilson*, 75 A.2d 530 (Pa. 1950).[9]

In *Corn*, on October 1, 1920, trustees of a railroad company mortgaged a coal mine. The railroad agreed to repay the loan by October 1, 1926. The mortgage eventually passed to E.A. Corn on September 25, 1947, more than 20 years after the loan was due. *Id.* at 531. Corn sued to have the coal mine sold to pay off the debt. The trial court imposed a nonsuit against him.

On appeal, the Supreme Court agreed with the trial court. It held that Corn did not rebut the "presumption that a mortgage, as well as all evidences of debt excepted out of the Statute of Limitations, unclaimed and unrecognized for 20 years, has been paid." *Id.* at 532. "This presumption of payment after a lapse of 20 years is a strong one and is favored in law as tending to the repose of society, the protection of the debtor, and the discouragement of stale claims." *Id.* Based on these statements, Assignee contends that an action for mortgage foreclosure has no statute of limitations. Assignee is mistaken.

By saying, "a mortgage, as well as all evidences of debt excepted out of the Statute of Limitations," the Supreme Court did not hold, as Seller suggests, that *all* mortgages have no statute of limitations. Instead, the High Court was referring to the statute of limitations that was in effect at the time,

---

[9] Our scope and standard of review for this third issue is the same as the first two. We reincorporate them by reference.

*i.e.*, The Act of March 27, 1713, 12 P.S. § 31 (repealed). Under Pennsylvania's previous statute of limitations, unsealed instruments had a statute of limitations of six years, but sealed instruments were not subject to a statute of limitations. Instead, for sealed instruments, the common law imposed "a presumption of payment after 20 years." ***Packer Society Hill Travel Agency, Inc. v. Presbyterian University of Pennsylvania Medical Center***, 635 A.2d 649, 651 (Pa. Super. 1993).

Hence, ***Corn*** involved the common-law presumption concerning sealed instruments, including sealed mortgages. Moreover, ***Corn*** is no longer the law. In the 1970s, the legislature enacted Title 42, The Judicial Code. Title 42 established a new statute of limitations. ***See*** 42 Pa.C.S.A. §§ 5501-5574.

Under the modern statute of limitations, "actions and proceedings must be commenced within four years," if they are based "upon a negotiable or nonnegotiable bond, note or other similar instrument in writing." 42 Pa.C.S.A. § 5525(a)(7). However, "an action upon an instrument in writing ***under seal*** must be commenced within 20 years." 42 Pa.C.S.A. § 5529(b)(1) (emphasis added).

Thus, the legislature shortened the period for bringing a claim based on an unsealed instrument from six to four years. It likewise supplanted the common-law, rebuttable presumption regarding sealed instruments with the irrebuttable presumption that a sealed instrument of debt cannot be enforced after 20 years. Thereafter, this Court held, "the proper limitation period

hinges on whether the relevant documents were 'under seal.'" ***Valley National Bank v. Marchiano***, 221 A.3d 1220, 1222 (Pa. Super. 2019).

The limitations period for a claim begins to run "from the time the cause of action accrued." 42 Pa.C.S.A. § 5502(a). As the Supreme Court explained in ***Fine v. Checcio***, 870 A.2d 850 (Pa. 2005), "a cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion. Thus, we have stated that the statute of limitations begins to run as soon as the right to institute and maintain a suit arises." ***Id.*** at 857 (citations omitted). "Once a cause of action has accrued and the prescribed statutory period has run, an injured party is barred from bringing his cause of action." ***Id.***

Here, Buyer defaulted on August 5, 2000, when she failed to make that month's installment payment to Seller. Thus, Seller could have first maintained his action to foreclose on August 5, 2000. Also, the writing upon which the Seller and Buyer memorialized their mortgage is not under seal. Hence, Seller had four years from the day of Buyer's initial default to foreclose upon Buyer's equity: namely, until August 5, 2004.

Assignee brought this action on October 15, 2020, over 16 years after the statute of limitations to foreclose upon Buyer's equity had run. Thus, it is clear and free from doubt that Assignee's lawsuit is time barred under 42 Pa.C.S.A. § 5525(a)(7).

The trial court erred by granting partial summary judgment to Assignee on his ejectment claim. We must reverse that portion of the trial court's order.

### D. Buyer's Counterclaim

In her fourth claim of error, Buyer seeks summary judgment on her counterclaim for quiet title to the property either by deed from Assignee or by judicial declaration. Buyer contends that, because the statute of limitations for enforcement of the mortgage has expired, Seller's security interest in the property (*i.e.*, his right to hold the legal title as collateral for the remainder of the sales price) was extinguished by an operation of the statute of limitations. As such, she claims entitlement to a general-warranty deed from Assignee conveying legal title to her.

Assignee responds that the only way in which Buyer can take legal title is by adverse possession. He cites no law for this proposition. **See** Assignee's Brief at 26. Furthermore, Assignee adopts the trial court's rationale that if he is "barred by the statute of limitations, the parties will be left in an absurd position. Neither one will have a remedy, and they will be stuck in limbo." **Id.** at 29. Again, he is mistaken.[10]

In this issue, Buyer challenges the denial of her motion for summary judgment on her counterclaim for quiet title. Thus, while the standard of

---

[10] We also note that Assignee challenges the trial court's determination that his second cause of action, for damages, is barred by the four-year statute of limitations. **See id.** at 27-29. Assignee says, because his "claim for damages is pursuant to an ejectment action, it is a charge upon real property subject to the 21-year statute of limitations and is not time barred." **Id.** at 28 (quoting 42 Pa.C.S.A. § 5530). However, as mentioned in Note 4, **supra**, Assignee did not file a cross appeal. Thus, his cause of action for contractual damages is not before us.

review remains *de novo*, we review the evidence in the light most favorable to Assignee, as the non-moving party. ***See LJL Transportation***, ***supra***.

This Court has dealt with situations where a mortgagee has failed to foreclose on mortgaged property in a timely manner. For example, ***In re Estate of Snyder***, 13 A.3d 509 (Pa. Super. 2011), involved a decedent who had two mortgages on her property. The mortgages were under seal and recorded. The decedent had defaulted, but the mortgagee took no action to enforce the mortgage for over 20 years. Then, after decedent passed away and her estate was raised, the mortgagee filed a claim against the estate to enforce the two mortgages. The estate's administrator raised the statute of limitations to prevent enforcement. The orphans' court agreed with the administrator. On appeal, this Court affirmed.

Initially, we explained that the statute of limitations for enforcement of mortgages under seal was 20 years, and the mortgagee's attempt to enforce them was time barred. However, the mortgagee contended the statute of limitations did not apply, "because both mortgages were recorded and became a secured lien against the real estate" and, "therefore, there was no action that was necessary to be commenced to obtain a judgment on the mortgages." *Id.* at 512. Instead, mortgagee believed that he could enforce his liens into perpetuity.

We rejected recordation as a basis for enforcing stale claims to collect on the mortgages. This Court said, "it is well settled in this Commonwealth that, although each is a distinct security, the payment of either a mortgage or

an underlying bond discharges both, and a release or extinguishment of either, without actual payment, is a discharge of the other, unless otherwise intended by the parties." **Id.** at 514 (quoting **Morgan Guaranty Trust Co. of New York v. Mowl**, 705 A.2d 923, 929 (Pa. Super. 1998), *appeal denied,* 727 A.2d 1121 (Pa. 1998)).

Although the mortgagee's cause of action concerned "the two mortgage liens securing the underlying bond and warrant guaranties, his argument neither disputed this central point nor provided any intimation that the parties intended the mortgage liens to be considered separate from the underlying debts." **Id.** Hence, "once the statute of limitations expired for claims regarding the two bond and warrant securities, those instruments had been effectively extinguished, and, therefore, the mortgage liens were simultaneously discharged." **Id.** In **Snyder**, we concluded that the running of the statute of limitations on a mortgage not only discharged the mortgagor's underlying debt; it extinguished the mortgagee's lien on the property.

Where, as here, the mortgage arises from the seller's retention of legal title as a security interest, functioning as a lien under an installment land contract, the discharge of the buyer's underlying mortgage debt extinguishes the seller's security interest. This is because "retention of title by [seller] serves as security for [buyer's] performance of the contract." **Anderson**, 417 A.2d at 1231.

Given that a buyer's obligation to perform is no longer enforceable by the seller once the statute of limitations has run, the seller (or the seller's successor in interest), who fails to commence an action for foreclosure within the statute of limitations, no longer has any interest in the mortgage or a security interest in the land to enforce. Thus, there is nothing for the seller's lien to secure by retaining legal title. Hence, a seller's security interest – *i.e.*, a seller's right to hold the legal title – is extinguished when the statute of limitations on a foreclosure action runs.

Here, Seller's interest in the legal title to the property was a security interest to collect on the mortgage. In 2004, the statute of limitations on a foreclosure action expired and thereby extinguished Seller's right to collect.

Therefore, even viewing the facts in the light most favorable to Assignee, Seller executed a quitclaim deed, conveying a legal title which he no longer had a right to retain or to transfer to Assignee. By operation of the statute of limitations, the balance due and owing on Buyer's mortgage is $0; thus, the mortgage is discharged.

Assignee received a legal title from Seller, but he – like Seller – has no right to retain it. Assignee must transfer legal title to Buyer.

In sum, Buyer is entitled to an order compelling Assignee to execute a general-warranty deed granting to Buyer unencumbered, fee-simple title to the property. Her quiet-title counterclaim is meritorious, as a matter of law.

Thus, the trial court's refusal to grant summary judgment to Buyer on her counterclaim was erroneous.[11]

Order granting partial summary judgment to Assignee and denying summary judgment to Buyer on her counterclaim reversed. Case remanded for the trial court to enter an order directing Assignee to execute a general-warranty deed, wherein he shall convey the legal title to the property, free and clear of any lines or other encumbrances, to Buyer.

Jurisdiction relinquished.

Judge Dubow joins this Opinion. Judge Nichols notes her dissent.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/30/2025

---

[11] Because the Court's disposition of Buyer's fourth appellate issue grants her full relief, we dismiss her fifth issue as moot.